Good morning, Counsel, Your Honor. May it please the Court, Katherine Hart representing Dwight Tamplin, Jr. As the Court knows, this is a case falling under the AEDPA, so I have to shoulder the burden of proving that the State Court decision denying my client his Faretto rights was unreasonable. And I submit to you that under 28 U.S.C. 2254 D.1 and D.2, the State Court was unreasonable in denying Mr. Tamplin his pro se rights. Mr. Tamplin had been accorded pro per status by the Fresno County Superior Court in February of 2005. In June, he did attempt to engage counsel to assist him. And as Mr. Tamplin explained in the hearing that took place on July 8th, he anticipated with the counsel he was retaining a cooperative type of sharing agreement where the counsel would assist him, but he would still have some type of pro se status. On June 22nd, Mr. Gregg Morris, attorney at law, made an appearance in the Fresno County Superior Court, made an appearance, and the minute order, which had been supplied to the Court, the minute order showed that Mr. Gregg Morris was to file a substitution of counsel and that Mr. Morris was to reserve the motions that Mr. Tamplin had filed as a pro per defendant. JUSTICE SCALIA. Is the Faretto right, as I've understood it, the Faretto right, is the right to either represent yourself or to have counsel represent you, correct? MS. MCGOWAN. That is correct. And the dissent in Faretto does talk about the confusion of hybrid representation. But Sandra Day O'Connor, in a later decision, McCaskill v. Wiggins, 465 U.S. 168, Justice O'Connor does talk about the fact that a person may have advisory counsel, that a pro per may have advisory counsel because a court may appoint advisory counsel, and that was a case where the pro per defendant later complained that advisory counsel had interfered with his right to proceed pro se. But, yes, basically Faretto is a right to represent oneself, but this later case shows that there is a possibility of appointing counsel to assist advisory counsel. JUSTICE SCALIA. And your client at one point indicated that he was having trouble and one of the reasons he thought he needed assistance was because he was having trouble understanding the rules and how they applied and when to object and that sort of thing, correct? MS. MCGOWAN. Well, he said that the — JUSTICE SCALIA. Is what I've just described essentially correct? MS. MCGOWAN. Yes. Yes. He had met in Greg Morris. He had met somebody whom he thought he could work with because the other attorneys, and there were a plethora of attorneys that had been representing him, and it wasn't his fault that new attorneys kept being appointed, but nothing had been filed. So he took it upon himself to file his own Penal Code 995 motion to dismiss, which was heard before June 22nd. So I think what I'm trying to stress to you is that he had been perhaps disappointed at the fact that the attorneys who had been appointed one after one and finding conflicts and everything had not really done anything to represent him, and yet, like many pro per defendants, he was uncertain about the rules of court. JUSTICE SCALIA. He didn't want a public defender. That was clear. MS. MCGOWAN. He didn't want a public defender, and that's kind of a theme that runs through many of these cases, and that he didn't want a public defender. And certainly — JUSTICE SCALIA. Does the Feretta right extend to that? MS. MCGOWAN. No. The Feretta right does not stand for the fact that you can have somebody besides a public defender. But the interesting thing, I think, about Mr. — JUSTICE SCALIA. My question is, and I probably didn't frame it correctly, can a person seeking to assert their Feretta rights say, I want to represent myself as long as I have advisory counsel of my choosing? MS. MCGOWAN. No. No, I don't see that. JUSTICE SCALIA. There's no Supreme Court authority saying that? MS. MCGOWAN. There is absolutely no Supreme Court authority saying that. What Mr. Feretta did after he was denied his pro per privileges, what Mr. Feretta did is that he made a request for co-counsel, which was denied, and then he also made three attempts for substitute counsel. That's not really widely reported in the Feretta decision, because it's in a footnote. It's in footnote 5 of the Feretta decision that says that Mr. Feretta did request that he assist the attorney as co-counsel and that he did make a request for substitute counsel, all of which were denied. The Court never said that because you made a request for co-counsel, to be co-counsel, or because you made a request to substitute counsel, that you have then forfeited that  JUSTICE SCALIA. It doesn't say the opposite either, does it? MS. MCGOWAN. It doesn't say the opposite either, but in this case, when the Fresno County Superior Court found Mr. Tamplin to be equivocal, they were relying on the fact that he never renewed his pro se request, and the case law does not require that he renew his pro se request. JUSTICE SCALIA. Was there anything equivocal about his request when made, the one he made on June the 30th? MS. MCGOWAN. Well, the hearing was on July 8th, but on June the 8th. JUSTICE SCALIA. Yes, but he requested it on the 30th. The hearing was on the 8th. MS. MCGOWAN. He requested on June 30th to go pro se, and he requested it because it was unequivocal. So, yes, he made that request on June 30th. We don't have a transcript of that hearing, but based on his request, it can certainly be assumed that he was earnest and intended to make a request. JUSTICE SCALIA. I guess I'll ask the other side, but is the State arguing that he was unequivocal or that he was equivocal in his request on the 30th or on the 8th? MS. MCGOWAN. The State — JUSTICE SCALIA. Or is it arguing that he was equivocal because he didn't renew the request? MS. MCGOWAN. The State is arguing both. I know you can ask them, but they are arguing both because one thing they point out about the July 8th hearing is that Mr. Champlin made a remark about how I want to represent myself until. So the State then has basically focused on that one remark of Champlin as saying what Champlin must have meant is that he wanted to represent himself until he found new counsel or he found counsel that he could work with. Mr. Champlin never finished the sentence, so we really are speculating as to what he meant by that. JUSTICE SCALIA. What effect, if any, was there about his request to have the retainer return to him that had been given to Mr. Morris? Does that suggest that he was thinking of getting other counsel? MS. MCGOWAN. I guess one could make an inference, but the most logical explanation is that his money is gone. He wants his money back. And so there is really nothing equivocal about wanting your retainer back when you... JUSTICE SCALIA. I thought he had said, will you help me? He asked the trial court, Fresno, will you help me get my money back so I can hire another lawyer? MS. MCGOWAN. Yes. JUSTICE SCALIA. That is exactly what he said, isn't it? MS. MCGOWAN. Yes. But the court said that the court didn't have authority to because Mr. Morris was not before the court. JUSTICE SCALIA. The Superior Court had no authority to order the disbarred lawyer to return the fee, right? MS. MCGOWAN. Correct. The lawyer wasn't disbarred at that time but was facing disciplinary proceedings to the State Bar, and the person, the attorney, was not before the court, so there would not have been jurisdiction to make that. JUSTICE SCALIA. When was Mr. Morris disbarred? MS. MCGOWAN. It was about a year later after all of the court proceedings. So I think it was in 2006 that he was disbarred, and then he was also prosecuted criminally. That really isn't in the record, but I did attach the records of the California State Bar showing the disciplinary proceedings, and the records show that at the time that Mr. Morris purported to step in to represent Dwight Tamplin, that he was also facing disciplinary proceedings. So I have an argument that Mr. Morris never officially came in because he never filed a substitution, and also that's an argument that the State made, the Fresno County District Attorney's Office made, at the time that the case was before the court, is they said that Mr. Morris never officially came in, and therefore, Mr. Tamplin still had pro se status, and the argument there at that point on the part of the State  was that Mr. Morris did not renew his request for pro se privileges once they had been denied. So my argument is that Mr. Tamplin made a very emphatic and very insistent request to go pro se. It doesn't appear to be a quibble. JUSTICE SCALIA. Is the Supreme Court authority you're arguing that was clearly established that affects your client's rights, is that Feretta itself? And we don't really have any other cases from the U.S. Supreme Court that would bear on... JUSTICE BREYER. They've never defined equivocal? JUSTICE SCALIA. I did a search through the Supreme Court on clear and unequivocal to try to determine whether they've defined it, and there was case after case after case where the terms were used without additional explanation. So I think that the terms are obvious on their face. Clear, meaning it's not muddy, and unequivocal, meaning that it is unambiguous. And Mr. Tamplin's request to go pro se was unambiguous because he repeated it, he insisted upon it, and then even after the Court said, no, I'm not going to allow you per privileges because I'm not going to give you a continuance here, even then, Mr. Tamplin said, I'm representing me, and the Court said, no, Mr. Morris is representing you. Well, Mr. Morris wasn't representing him. I think there may have been... JUSTICE SCALIA. And was he then given a public defender? JUSTICE BREYER. He was then given a public defender. Actually, it was a public defender with the alternate public defender's office. The way it works there is there's a public alternate. So he was given an attorney with the public defender's office, and that attorney declared a conflict. And then with the alternate public defender's office, he was given another attorney who remained the attorney for the trial. JUSTICE SCALIA. The first attorney was Ms. Hall, correct? JUSTICE BREYER. No, the first attorney I'm not sure of because there were two or three attorneys, and then there was an attorney who represented him at the preliminary hearing. And then after the preliminary hearing, Bonnie Bitters, and after Bonnie Bitters came Robert Lamannuzzi, and after that came Kimberly Hall, who filed her conflict, but she wasn't until the winter of 2005. So there was this spate of time over a five- or six-month period in which different attorneys were appointed to Mr. Champlin, and attorneys found conflicts, and so new attorneys got appointed. No wonder he was dismayed at the fact that motions had not been made when there had been this repetitive cycle of conflicts and new attorneys. JUSTICE SCALIA. So I'm clear. As of the July 2005 hearing, Ms. Hall hadn't previously represented him in this matter? JUSTICE BREYER. She had represented him for a short period of time. It would have been, I think, approximately December of 2004, January of 2005, and then Mr. Champlin then requested to go pro se. But there were a couple of attorneys that did file conflicts. JUSTICE SCALIA. One last question. JUSTICE BREYER. Oh, sir, please go ahead. JUSTICE SCALIA. One last question. JUSTICE BREYER. Yes. JUSTICE SCALIA. With respect to the statements by the State Court of Appeal that there were many hearings between July of 2005 and the trial date at which the opportunity to renew the request was there but not made, what is your response to that? JUSTICE BREYER. That Mr. Champlin did not have any obligation to renew the request for pro se privileges once he had made an emphatic, insistent, unambiguous, and unequivocal request to establish foretter rights, that he did not have any obligation ever there to renew it. And the case that I pointed out for that principle was United States v. Arlt. It's in my points and authorities, A-R-L-T. And that is a case where this Court said there was no obligation for a defendant to renew his request for self-representation once his pro per privileges had been denied. So that's a case that I believe was powerful authority for the fact that he did not need to renew his request. And the U.S. Supreme Court certainly in Ferretta, although they're discussing timeliness, but if you look at all the factual underpinnings of Ferretta, the U.S. Supreme Court didn't say anything about Mr. Ferretta should have repeated his pro se request. And surely with Mr. Ferretta having asked for substitution of counsel, Mr. Ferretta himself would have known how to file something. So in this case, I'm relying on the, I haven't discussed it yet, but it's discussed in detail in my opening brief, the Moore v. Calderon case, which is an AEDPA case decided by this Court where the, on time, on a timeliness issue, where the individual requested pro per privileges approximately two weeks and two days before trial. And in that case, Mr. Moore also, the first time he went into court, requested that he have co-counsel, advisory counsel. So I think, Your Honor, that when there is a pro se defendant, the pro se defendant often wants to go co-counsel or to have the assistance of advisory counsel. So that doesn't really, the fact that they may want that doesn't really nullify their pro per request. Okay. Now we, excuse me, we've taken you well over time. Oh. Let's hear from the other side. Yes. We'll give you a chance to respond. Okay. Thank you. Good morning, Your Honors. David Andrew Eldridge, Deputy Attorney General for Respondent. I don't think that the state court anywhere suggested that there's an obligation to complain once your pro request has been denied. I think they simply cited that as further evidence that that's not what he wanted in the first place. That really what he wanted was compatible counsel. Can we clear off some underbrush and address the timeliness question? Are you arguing that it was untimely? It is untimely, but my major argument is that no Supreme Court case has ever held that you have a right to seek multiple self-representation status. He made a request, which I think was probably untimely the first time, but they granted it. Then he decided he wanted counsel. So you don't have a situation where a person started out originally like Mr. Ferretta did, Mr. Ferretta acted literally the day after the accusation was filed, and who sticks to it persistently. What you have here is someone who asks and gets it. Then he changes his mind once he realizes it's more, there's more trouble than perhaps he anticipated. And then it seems clear he would have kept with counsel the entire time, but for the external. Let me ask it this way, and I'm not asking you to concede on the question of whether it's equivocal. Let's assume for purposes of my question that on June the 30th and then at the hearing on the 8th, he unequivocally says, I want to go pro per. Was that a timely request? Well, there's no, no, in the sense that there is no Supreme Court case that says acting just two weeks before a scheduled trial date is timely. What do you do with our Moore case where we interpreted Ferretta as clearly stating that two weeks and two days was timely? Here it's two weeks and one day. Well, actually, Moore was prior to Richter, Your Honor, and this court did a lot that was beyond the scope of EDPA's constraints prior to Richter. Richter made clear that Let me ask it this way. The court in Moore says we apply the EDPA standards and it's that that's what the holding was. That's fine. However, there are at least two things. One, if you're looking at an initial request, you may establish one rule from that from Ferretta, de novo, or finding it co-established, but this is not the initial request. His initial request was granted. Well, I understand that. And so I'm willing to say that he had it granted. I'm even willing to say that he was represented by Morris for purposes of my question, although I don't think he ever was. But on the 30th of June, he says, I want to go pro per. And the trial is then scheduled for two days and one week, two weeks and one day after that. And you're saying that two weeks and one day is not timely. I'm saying there's no Supreme Court case saying that that's timely. And I am saying that there is no Supreme Court case addressing at all the existence of a right to go pro per once you have already done so and gone back. That is simply not what Ferretta was. As to equivocation, I don't think that equivocation can be equated to lack of ambiguity. In the Miranda cases, in fact, they repeatedly point you must be unambiguous and unequivocal. Unambiguous means it speaks to how clear you are. Equivocation goes to whether or not you stick with one or the other. So it can't be, was he on this date unequivocal, Your Honor? It is rather equivocation is something that generally goes over the course of time. He did equivocate. He started out wanting representation by counsel. No. Did he equivocate after June the 30th? Because he made a request on the 30th. And if that's a timely request, then that's a valid Ferretta request unless it's equivocal. Well, again, you're acting as equivocal, and certainly no Supreme Court case has ever said so, that it is something that you judge basically by the last statement. When did he ask the court to assist him in recovering his fees from the disbarred lawyer? We know on the date when they, when it was actually, the second request was denied. But there is something in the record saying that there had been something the day before when he had asked, because on the date they're having the hearing, he says, you still haven't ordered him to return my money. So I'm not. No, I'm asking, let me be more precise. When, my understanding from the record is that at some point, he said, I'd like the court to help me in recovering the fees or words to that effect until dot, dot, dot. When did that happen? This happened during the hearing on the second request. It was part of that, the entire colloquy with the court. The court asked why. At the same time and the same hearing where he was asking for self-representation. Yes, we do know, however, he had, he had said something the day before. So yes, the court asked, why did you hire Mr. Morris? Well, I, I needed counseling to do the things I couldn't. And he says, and he brings up, you still haven't told him to give me back the money. His volunteering that point, again, suggests that that is related to the issue they're discussing. In other words, he doesn't want counsel. I mean, he doesn't want to represent himself. He wants counsel, but he wants counsel he can hire. What does the trial transcript tell us about whether Mr. Tamplin complained during the course of the trial about not being able to represent himself or the inadequacy of the counsel appointed to help him to represent it? On the first point, we have a state court finding that he didn't complain further, but I have not checked the transcript myself. I'm now talking about something different than renewing the request. I'm asking if during the course of the trial, did this individual at any point during the trial complained to the court about the inadequacy of the counsel he had? I believe he did not, but I have not. Maybe your co-counsel, your opposing counsel can tell us that. Thank you. Mr. Elbridge, going back to the question of timeliness in light of the two weeks and one day between June 30 and the scheduled trial of July 15, ultimately the issue about whether to appoint new counsel came up on July 8, correct? That sounds right. That's my question is, is there any effect on the timeliness evaluation of two weeks and one day when it's known that current counsel will not be able to represent the defendant? Therefore, would it be practical to assume that new counsel coming in would be ready to represent him at trial with one week to prepare? It may or may not be practical. It possibly isn't, although one can never know. But the fact is the Supreme Court's never passed on that question at all. So it's really up to the state courts to sort of fill in the void, and it can't be contrary to any case out there when there isn't one from the Supreme Court. Did it matter that the counsel who was originally appointed after July 8 had previously represented the defendant? I am, I think that would only go in favor of saying he might be available at that point. Yes. But beyond that. Sorry, just, again, it goes to the issue of timeliness in the two weeks and one day. Does the, I asked earlier whether it mattered that the trial ultimately, the trial was scheduled for one week after new counsel was going to be put into place? And then my current question is, does it matter that the new counsel who was first identified, I believe it was Ms. Hall, who had previously represented the defendant, such that she might be ready for trial in a week? Again, I think might tends to go in favor of the discretion to deny. But again, my major point is, that isn't even necessary because we simply don't have a Supreme Court case saying anything in their, in favor of a defendant's right on this question at that point. Thank you, Your Honor. Okay. Thank you. Now, we've taken you over time. Let's put a minute on the clock and see what happens. All right. Thank you. Yes, Your Honor, you've raised a number of questions, and I don't know whether I can answer. One of the questions that you asked was whether during the actual trial that Mr. Tamplin complained about Attorney Lyndon Lindahl, who had been appointed to represent him, after Ms. Hall had come back into the case and then she declared a conflict. I don't know how long she was on the case, a day or something, and then Mr. Lindahl came in on the case. I don't remember. I have read portions of the trial transcript, but I don't remember whether there was a complaint or not during trial. I can't answer that. I do know that there were voluminous complaints after. There were voluminous complaints when Mr. Tamplin was represented on appeal by Mr. Durham, and the court asked for Mr. Lindahl to explain certain things. But I don't know if during the trial there was a complaint about him. As far as the timeliness, you know, new counsel couldn't have been ready to have tried this case. It would not have been really possible. There was a pitches motion that Mr. Morris was supposed to re-serve, and that motion requires 16 days' notice before it can be heard. So a continuance of the trial was an inevitability. I think it was simply here that the court didn't believe unreasonably that Mr. Tamplin was sincere, earnest, emphatic, and unambiguous about his request to go pro se. Thank you very much. Thank both sides for your arguments. Case of Tamplin v. Munoz is submitted for decision. The next argument on the calendar this morning, Maldonado v. Paramo.
judges: Hawkins, W. Fletcher, Kronstadt